IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| v. | ) | No. 07-CR-30078 |
| JASON JOHNSON, | ) | |
| Defendant. | ) | |

REPORT AND RECOMMENDATION

BYRON G. CUDMORE, U.S. MAGISTRATE JUDGE:

This cause comes before the Court on Defendant's Motion to Suppress Evidence (d/e 7) (Motion to Suppress). The motion is fully briefed, and pursuant to Local Rule 72.1, the District Judge has referred the matter to me for an evidentiary hearing and Report and Recommendation. See Text Order, October 31, 2007. After carefully considering all of the submissions of the parties, hearing evidence on the matter, and pursuant to 28 U.S.C. § 636(b)(1)(B), I recommend that the Motion to Suppress be DENIED.

I.  BACKGROUND[1]

Defendant Jason Johnson (hereinafter Johnson) is charged in a one-count Indictment (d/e 1) as a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1). Based upon the testimony heard in open court on December 4,

---

[1] **This Report and Recommendation is prepared without the benefit of a transcript.**

2007, Johnson was stopped on May 11, 2007, at approximately 2:05 p.m., while driving a Suburban southbound on Interstate 55. The vehicle was stopped by Illinois State Police Trooper Steven Ent near milepost 87 because windows in the front seat area of the vehicle were darkly tinted in violation of Illinois state law. See 625 ILCS 5/12-503. Johnson seeks to suppress evidence seized from his person and vehicle as a result of a subsequent warrantless search, together with any oral or written statements made by him to officers of the Illinois State Police.

During the evidentiary hearing on the Motion to Suppress, the Government entered into evidence Government's Exhibit 1, which is a copy of a video recording of the event from Ent's squad car camera. Portions of the video were played in conjunction with Ent's testimony at the evidentiary hearing.[2] At times, an "M" appears on the video. Ent explained that this symbol indicates that his microphone has been activated. However, the video lacks audio recording. According to Ent, he discovered the audio problem when he reviewed the video in connection with the creation of his report of the incident. Ent testified that he reported this problem to an Illinois State Police technician who determined that the microphone had a faulty cord and repaired it.

---

[2]The video indicates that it was associated with a Trooper Kink. Ent explained that Trooper Kink was the trooper assigned to the car before him and that State Police technicians were unable to change the name on the camera's recordings. The video also shows a date of May 10, 2007. Ent testified that this was a day off, and that the video accurately reflected the events of May 11, 2007. The Court notes that the video was admitted without objection by the Defense.

Trooper Ent testified that, after the vehicle stopped, he approached the passenger side of the Suburban.  The video reveals that this occurred at approximately 2:06:32 p.m.  According to Ent, there was a female passenger in the front passenger seat.  Ent identified Defendant Johnson in court as the individual who was driving the Suburban.  Ent testified that he asked Johnson for his driver's license, which Johnson produced.  According to Ent, when Johnson handed him his driver's license, Johnson's hand was shaking so much that it caused the license to bounce up and down.  Ent, who has been a State Trooper for seven and a half years, testified that Johnson exhibited "much more extreme nervousness" than he generally sees in individuals involved in traffic stops.  Ent testified that Johnson asked why he had been stopped and Ent explained the reason to him.

Ent testified that he then asked Johnson to provide proof of insurance on the vehicle.  According to Ent, when Johnson produced the insurance paper, his hand was shaking such that the paper rattled.  Ent characterized this as "unusual."  Ent testified that, after receiving Johnson's license and proof of insurance, he returned to his squad car to run a computer inquiry on Johnson.  The video shows Ent returning to his squad car at approximately 2:08:00 p.m.  On cross-examination, Ent estimated that he spent approximately one minute and twenty seconds at the passenger side window, during which time he determined that Johnson was excessively nervous.  Ent conceded, however, that

he does not remember having any prior contact with Johnson and that he had no idea of Johnson's normal appearance when dealing with law enforcement. On cross-examination, it was noted that the "M" symbol disappeared from the video at the point that Ent returned to the squad car. Ent testified that he turned the microphone off while he was in the squad car to conserve its battery because there were no suspects in the squad car.

 Ent testified that he ran the computer inquiry by Johnson's name and date of birth, which is his customary practice. According to Ent, the inquiry revealed that Johnson had a valid driver's license and that he was on parole. Ent testified that when he became aware that Johnson was on parole, he ran his criminal history. Ent testified that the criminal history check revealed that Johnson had an extensive drug-related criminal history, which included several arrests for drug-related crimes. Ent testified that this process took "a couple minutes." According to Ent, during this time, he also requested that Trooper Anthony Maro come to the scene, given Johnson's criminal history and the fact that Johnson was on parole. Ent testified that he asked Maro to come to the scene for backup and because he knew that Maro worked with a canine partner.

 Ent testified that Johnson's insurance card was valid on its face and, further, that an inquiry into the temporary registration on the Suburban revealed that the registration was valid and that the SUV was registered to Johnson. Ent testified that he then began writing a warning ticket for Johnson for the traffic

violation. Ent stated that he remained in his squad car while writing the warning. According to Ent, Maro arrived on the scene while Ent was writing the ticket.

Ent testified that, when he finished writing the ticket, he returned to the Suburban and asked Johnson to step to the rear of the vehicle. According to Ent, it was approximately 2:17 p.m. when he returned to the Suburban. The video shows Ent returning to the Suburban at approximately 2:17:13 p.m. On cross-examination, Ent admitted that when he returned to the Suburban with the warning ticket, he wanted to search the vehicle. Ent testified that he planned on asking Johnson for consent to search, and in the event consent was refused, he intended to have the canine conduct a walk around of the vehicle.

Ent testified that Johnson complied with his request and met him at the rear of the Suburban. The video shows Ent and Johnson meeting at the rear of the Suburban at approximately 2:17:44 p.m. Ent testified that, at that point, he explained the warning to Johnson and asked Johnson to sign it. The video reveals that Johnson signed the ticket at approximately 2:18:06 p.m. Ent testified that he did not recall whether Johnson's hand was shaking while he was signing it. Ent stated that Johnson was moving around more than normal during this time. Ent testified on cross-examination that he did not speak to Maro prior to returning to the Suburban. The video shows Maro entering the picture at approximately 2:18:33 p.m. At this time, Maro approached Ent and Johnson as they stood behind the Suburban. Ent testified that he also asked Johnson about

his parole and whether his parole agent knew he was traveling. According to Ent, Johnson replied that he was on parole for drug-related offenses and that his parole agent knew he was traveling. Ent testified that he then asked Johnson whether he had anything illegal in the car, to which Johnson replied, "No." According to Ent, the following exchange then occurred. Ent asked Johnson if the officers could search his car. Johnson replied that he would not mind a search, but that he needed to get on his way. Ent then told Johnson that he needed a "yes" or "no" answer, to which Johnson replied that he was on a schedule and needed to get to Collinsville, Illinois to see his son. Ent testified that, at this point, he had no clear consent to search the vehicle. According to Ent, he then advised Johnson that the canine would do a walk around of the vehicle.

Ent testified that, in anticipation of this walk around, Ent performed a pat-down search of Johnson for officer safety. The video reveals that this occurred at approximately 2:19 p.m. According to Ent, the purpose of the pat-down was to uncover any weapons that Johnson may have been carrying on his person. Ent testified that he did not feel any hard objects during the pat-down other than a wallet, which he identified as such. Ent testified that he felt a wad of cash and questioned Johnson about it. According to Ent, Johnson admitted that he had cash in his pocket and stated that it was for an axle for his vehicle.

On cross-examination, Ent testified that Johnson signed the warning ticket prior to the time Ent began questioning him. Ent further testified that he may have returned Johnson's driver's license and proof of insurance prior to seeking consent to search. Ent stated, however, that he was sure that he was still holding Johnson's copy of the warning ticket when he asked for consent. Ent testified that, following the pat-down, he handed Johnson a copy of the written warning. The video reveals that this occurred at approximately 2:19:50 p.m.

Ent testified that, after presenting Johnson with the written warning, he went to speak to the female passenger and asked her to exit the vehicle. According to Ent, he questioned the passenger about the trip and she stated that she needed to get to Collinsville for work. Ent stated that he believed that this explanation was inconsistent with the one given by Johnson. Ent testified that he then asked the passenger to step out of the car to allow the canine to perform the walk around. Maro remained with Johnson during this time. Ent testified that, when he returned to the rear of the Suburban, Maro informed him that Johnson had stated that people had smoked marijuana in the vehicle.

According to Ent, Maro and the canine then performed the walk around. The video reveals that this occurred at approximately 2:22:07 p.m. According to the video, Maro and the dog had finished the sniff by 2:22:45 p.m. Ent testified that Maro informed him that the dog had alerted on the car. Ent testified that, at this point, he determined that probable cause existed for a search of the vehicle

based on Johnson's visible nervousness, the conflicting stories, the fact that Johnson was on parole and had a drug-related criminal history, and the canine alert. Ent testified that he began to search the vehicle. The video reveals that the search began at approximately 2:23:39 p.m. Ent testified that he found .22 caliber ammunition in a purse in the front seat and asked Johnson if there was a gun in the car. Ent testified that Johnson did not respond, but rather stared off into space. The video reveals that this exchange occurred at approximately 2:26:40 p.m. At this point, Maro placed Johnson in handcuffs while Ent placed the passenger in handcuffs. Ent testified that he then continued the search of the vehicle and eventually located a gun and suspected narcotics hidden in a sock behind the stereo console.

The Government also called Trooper Anthony Maro as a witness. Trooper Maro testified that he was working on May 11, 2007. According to Maro, at approximately 2:15 p.m. on May 11th, he was called to participate in a traffic stop of a Suburban on Interstate 55. Maro testified that he was working with his canine, Vik, a dual purpose dog. Maro explained that, as a dual purpose dog, Vik has been trained in both apprehension and narcotics detection. Maro testified that, as a narcotics detection dog, Vik has been trained to alert to five odors – marijuana, cocaine, crack cocaine, heroin, and methamphetamine. Maro testified that he had been working with Vik for one and a half years prior to May 11, 2007, and had worked with other canine partners prior to Vik.

Maro testified that when he arrived on the scene, Ent was getting Johnson out of the Suburban. Maro testified that he walked up to the two men as they were talking at the rear of the Suburban. On cross-examination, Maro testified that he did not speak to Ent prior to Ent asking Johnson to exit the vehicle. However, Maro conceded that his report, written a day or so after the incident, indicates that Ent informed him upon arrival of Johnson's extensive drug-related criminal history.

Maro testified that when the men were talking at the rear of the Suburban, he noticed that Johnson was shaking a bit or trembling. Maro stated that he was present when Johnson signed the warning ticket, but that he does not recall seeing Ent return Johnson's driver's license and proof of insurance. Maro confirmed that Ent sought consent to search the vehicle, but did not receive clear consent from Johnson. According to Maro, when Johnson replied that he was on a schedule, Ent informed him that the dog was going to conduct a walk around sniff of the vehicle. Maro testified that he did not ask Ent what basis he had for the sniff. Maro observed Ent perform the pat-down of Johnson, which he characterized to be standard procedure prior to a dog sniff. Maro stated that, after the pat-down was conducted and no weapon was found, his officer safety concerns were dispelled. Maro testified that, when Ent went up to deal with the passenger, Johnson began questioning Maro about the walk around. Maro testified that he explained the procedure to Johnson, at which point Johnson

informed him that marijuana had been smoked in the vehicle earlier that day. According to Maro, typically, if marijuana had been smoked in a vehicle that day, an individual would be able to smell it. Maro testified that he did not smell marijuana around the Suburban, despite the fact that the windows were open. Maro testified that Ent signaled him to begin the walk around, and he did so. Maro stated that he walked Vik around the Suburban two times, and on the second pass, Vik alerted to the driver's door.

The Defense rested without calling any witnesses.

## II. ANALYSIS AND CONCLUSIONS OF LAW

The Fourth Amendment to the Constitution guarantees the "right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. A defendant seeking to suppress evidence because of a violation of the Fourth Amendment must first establish that he has standing to challenge the search or seizure. United States v. Sweeney, 688 F.2d 1131, 1143 (7th Cir. 1982). Once the defendant has established standing in a case in which law enforcement officers conducted a warrantless search, the burden of proof shifts to the government, because warrantless searches are "per se unreasonable under the Fourth Amendment-subject only to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (1967). At that point, the Government bears the burden of establishing by a preponderance of the

evidence that an exception to the warrant requirement applies.  United States v. Basinski, 226 F.3d 829, 833 (7th Cir. 2000).

In the instant case, the Government conceded, on the record at the evidentiary hearing, its belief that Johnson had standing to challenge the search at issue.  This Court also believes that based on the evidence presented Johnson has Fourth Amendment standing.  Thus, the burden shifts to the Government to establish, by a preponderance of the evidence, that an exception to the warrant requirement applies.

As an initial matter, the Court notes that probable cause existed for the traffic stop in that Trooper Ent observed a violation of state law.  Trooper Ent testified that he observed that the vehicle that Johnson was driving had tinted front windows in violation of Illinois law.  See 625 ILCS 5/12-503.  The decision to stop an automobile is reasonable when the police have probable cause to believe that a traffic violation has occurred.  Whren v. United States, 517 U.S. 806, 810 (1996).  Probable cause exists when "the circumstances confronting a police officer support the reasonable belief that a driver has committed even a minor traffic offense."  United States v. Cashman, 216 F.3d 582, 586 (7th Cir. 2000).  The record supports the conclusion that Trooper Ent had probable cause to believe that a traffic offense had been committed at the time he initiated the traffic stop.

It is well-established that a canine sniff of the exterior of a vehicle for narcotics does not implicate Fourth Amendment concerns, providing that the individual is lawfully detained at the time of the sniff.  Illinois v. Caballes, 543 U.S. 405 (2005).  Johnson asserts that the traffic stop concluded at the point that Johnson signed the warning ticket and refused consent to search.  Therefore, according to Johnson, Ent needed reasonable suspicion to detain him beyond this point.  A stop justified solely by the need to investigate a traffic violation "can become unlawful if it is prolonged beyond the time reasonably required to complete that mission."  Id. at 407.  The Seventh Circuit has expressly held that "[a] traffic stop does not become unreasonable merely because the officer asks questions unrelated to the initial purpose for the stop, provided that those questions do not unreasonably extend the amount of time that the subject is delayed."  United States v. Martin, 422 F.3d 597, 601-02 (7th Cir. 2005).  Moreover, information lawfully obtained while investigating the traffic offense "may provide the officer with reasonable suspicion of criminal conduct that will justify prolonging the stop to permit a reasonable investigation."  Id. at 602.

In the instant case, Maro and his canine arrived on the scene while Ent was still writing the warning ticket.  The Court notes that there is no evidence that Ent took an unreasonable amount of time to write the warning ticket.  The record reveals that Ent returned to his squad car at approximately 2:08:00 p.m. to write the ticket and reapproached the Suburban at 2:17:13 p.m., just over nine minutes

later, to present it.  Ent testified that this was a normal to "fairly quick" amount of time to receive relevant information and issue a warning ticket, and there is no evidence to contradict this assertion.  Furthermore, there is no evidence that Ent delayed in any way to allow Maro to reach the scene.

The record reveals that Johnson signed the warning ticket at approximately 2:18:06 p.m., but it is clear that Ent did not hand Johnson the ticket at that time. Johnson fails to cite any cases that support his assertion that the traffic stop necessarily concluded with the signing of the ticket.  After Johnson signed the ticket, Ent asked him several questions unrelated to the initial purpose for the stop and sought consent to search the vehicle.  Ent's questions, however, concluded by 2:19 p.m. and thus, they did not unreasonably extend the amount of time that Johnson was delayed.  <u>Martin</u>, 422 F.3d at 601-02.  At 2:19 p.m. Ent performed a pat-down of Johnson, which was standard procedure prior to a canine sniff.  Ent then asked the passenger to exit the vehicle, also in preparation for the sniff.  Thus, Ent began conducting necessary predicate steps for the canine sniff immediately after his brief questioning of Johnson concluded. The canine began its walk around at approximately 2:22:07 p.m., just three minutes after Johnson signed the warning ticket and only sixteen minutes after Ent first approached the Suburban.

The instant case is similar to <u>United States v. Carpenter</u>, which involved a dog sniff arising out of a situation in which one officer was giving the defendant a

ticket for evading a red light, while another officer arrived on scene with a drug-detection dog. Carpenter, 406 F.3d 915 (7th Cir. 2005). The Carpenter Court noted that an up-to-five-minute delay for a dog to arrive constituted a "modest incremental delay for a person already lawfully arrested" that could not be characterized as "unreasonable." Id. at 916-17. In the instant case, it is clear that Johnson was lawfully stopped. The walk-around began just three minutes after Johnson signed the warning ticket and only sixteen minutes after Ent first approached the Suburban. There is no indication that Johnson was delayed in any way in order to allow the canine to arrive on the scene. The walk around itself took less than one minute, and even if the preliminary steps of the pat-down and the clearing of the vehicle are included in the calculation, the entire process for the sniff took less than four minutes. It is clear from the record that the instant traffic stop was lawful in its inception and that it was not prolonged beyond the time reasonably required to complete its mission. See Caballes, 543 U.S. at 407. Thus, under the facts of the instant case, it is clear that the canine walk around was conducted during the course of a lawful traffic stop, and thus, it did not implicate Johnson's legitimate privacy interests. Id. at 409. Therefore, the canine sniff was permissible.

Moreover, even if the traffic stop could be deemed to have concluded at the point Johnson signed the warning ticket, Ent was justified in briefly detaining Johnson. Under Terry v. Ohio, a police officer may perform an investigative stop

when there is reasonable suspicion, based on specific and articulable facts, that "criminal activity may be afoot." Terry, 392 U.S. 1, 30 (1968). When there is reasonable suspicion to believe that the occupants of a vehicle are engaged in illegal activity other than the traffic violation, an officer may prolong a traffic stop to investigate that activity. United States v. Walden, 146 F.3d 487, 490 (7th Cir. 1998). During the course of the traffic stop, Ent lawfully determined that Johnson had a drug-related criminal history and was on parole. "Reasonable suspicion of criminal activity cannot be based solely on a person's prior criminal record;" however, "a criminal record in conjunction with other information can form the basis of a reasonable suspicion." Id. at 490-91. In addition to knowledge of Johnson's criminal history, Ent testified that he observed Johnson displaying extreme nervousness to the extent that his hand shook such that his driver's license bounced up and down and his proof of insurance rattled. Ent testified that this was more extreme nervousness than he generally sees in individuals involved in traffic stops. The Seventh Circuit has recognized that nervousness is a factor that can be considered in the totality of circumstances analysis. United States v. Brown, 188 F.3d 860, 865 (7th Cir. 1999). The Court believes that the criminal history and extreme nervousness taken together constitute specific and articulable facts sufficient to establish reasonable suspicion to detain Johnson for four minutes, from the time he signed the ticket at 2:18:06 p.m. until the walk around began at 2:22:07 p.m.

Finally, the Court notes that, after the dog alert, it is clear that Ent had probable cause to search the Suburban and, thus, this search was Constitutionally justified under the automobile exception. The automobile exception allows for a warrantless search of a vehicle when officers have probable cause to believe that the vehicle contains contraband or evidence of a crime. See Carroll v. United States, 267 U.S. 132, 153-56 (1925). "A search of an automobile based on probable cause lawfully extends to all parts of the vehicle in which contraband or evidence could be concealed, including closed compartments and trunks." United States v. Patterson, 65 F.3d 68, 70 (7th Cir. 1995) (internal quotations and citation omitted). Probable cause exists if, given the totality of the circumstances, there is a "fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983).

At the time he searched the Suburban, Trooper Ent had observed Johnson to be overly nervous, he knew that Johnson had a drug-related criminal history and was on parole, Johnson had admitted that someone had been smoking marijuana in the Suburban earlier that day, Johnson and the passenger had provided different reasons for their trip, and the canine had alerted to the car.[3] Based on the totality of these circumstances, there was a fair probability that

---

[3]The Seventh Circuit has recognized that a trained dog alert can elevate reasonable suspicion to probable cause. See United States v. Ganser, 315 F.3d 839, 843-44 (7th Cir. 2003).

contraband would be found in the vehicle, and thus, probable cause to search existed. Therefore, the record supports a finding that Ent's warrantless search of the Suburban is valid.

### III. CONCLUSION

For all the above reasons, I strongly recommend that Defendant's Motion to Suppress Evidence (d/e 7) be DENIED.

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk of the Court within ten working days after being served with a copy of this Report and Recommendation. See 28 U.S.C. § 636(b)(1). Failure to file a timely objection will constitute a waiver of objections on appeal. See Video Views, Inc. v. Studio 21, Ltd., 797 F.2d 538, 539 (7th Cir. 1986). See Local Rule 72.2.

ENTER:   December 10, 2007

> s/ Byron G. Cudmore
> _____
>      BYRON G. CUDMORE
> UNITED STATES MAGISTRATE JUDGE